United States of America v. Wynder and Brown, is it Wynder or Winder, Wynder, okay, Wynder. And again, everybody just take a second, get settled up there at the podium, get the microphones where you need them, as we allow counsel for the previous case to remove their materials. Okay, Mr. Murphy, I understand you'd like to reserve a minute and Mr. Jacobs is the same, right? Very good. Please proceed. Good morning, Your Honors. May it please the Court, Tim Murphy, representing Mr. Wynder, behalf of the Federal Public Defender's Office. We have two issues, Judge, I've limited the amount of time. I would like to make a couple of comments, first about the restitution order and then turn to the ineffective assistance argument under point one. The $529,000 restitution order, we believe, was plainly erroneous. It did not address the concepts of compensating victims while still making sure that we're not exceeding the actual loss. The reason we say this, we've presented a various list of expenses that were written out of the operating account on behalf of the union. We think this is- So can I just be clear? I understand there are two accounts we're talking about, right? Yes, Your Honor. And the court, as I understand it, based the restitution amount on amounts that it concluded were fraudulently withdrawn from the annuity funds. Is that right? That's correct. You're basing your argument on the notion that you've pointed to expenditures from the union or LIBAs account that, in your view, are not, I guess, improper? Or, well, you can tell me how you characterize that. And so it's sort of the flow through that you're suggesting that even if these amounts were fraudulently withdrawn from the annuity fund, meaning they were withdrawn pursuant to deceit and lies, because some of the money, in your view, was then ultimately spent on things that were, I don't know if you'd say permissible or for the benefit of some of the participants of the annuity fund, there should be set off. Am I capturing the gist of your- You are. You're absolutely, Judge. Okay. And I just, to move through this even quicker, I'd ask the court to consider the Rodriguez decision. Your Honors will remember this. This was Senator Rodriguez, state senator. He funnels public money through a not-for-profit. They hold a gala. They hold a fundraiser. Individuals go there. The way that the court addressed restitution was just to come up with the donor list. This court said, as the court's restitution order accepted the premise in all instances that the amount donated constituted the donor's loss, we vacate to address the actual loss. What this court was looking at was that when you go to a fundraiser, you get food. The actual loss because the donors received something when they attended the dinner. But in this case, the theory here is that there's a prohibition on using the annuity fund money to benefit the union. And so it's true, some beneficiaries of the fund are also members of the union, but they're not getting a benefit in their capacity as fund members. They're getting a benefit in their capacity as fund members. Doesn't that make, sorry? I know what you're saying, Judge. Yes, right. They're not getting a benefit in their capacity as fund members. They're getting a benefit in their capacity as union members, and you're not allowed to do that. So why doesn't that make a difference? We disagree with the premise because of the comptroller's directive. But even if we're wrong about that, the question of restitution is making victims whole. It's not evaluating an amount that we should punish someone for something. If they are gaining a benefit, it should be offset. And I think that's consistent with Rodriguez. But the victim is not the members. The victim is the annuity fund, right? So your argument is not that the victim ended up getting a benefit. Your argument is that actually it was permissible to use some of the annuity funds to benefit members. And even though they're being benefited not in their capacity as members of the fund but members of the union, it should still count as a permissible expenditure. Not that the victim is getting a benefit. The victims that were awarded this restitution order, Judge, were members of the union. So if the members are gaining a benefit, we believe the offset principle from Rodriguez should apply. Can I ask you this? Yes, Your Honor. You started, I think, properly acknowledging that we're looking at this through the lens of plain error, because there was no objection in the trial program. Yes, Judge. So it's your burden to show that there was prejudice, not just that there might have been prejudice. And it seems that what you have shown is a list of expenditures which you itemize as attorney or is it the auditor? Auditor, auditing as well. Auditing or accounting. And that you say that any number of those might have been for the benefit of the audit fund. But I don't think that you've shown that those were necessarily for the benefit of members of the union who had a stake in the annuity fund, have you? It's just that, look, there are these entries that say attorney. Maybe they were helpful, maybe they were not. Why should we conclude that you have demonstrated that in fact, something that just says attorney is a payment to some lawyer, it is and must of necessity have been of benefit to the annuity funder or those who are members-  Or beneficiaries of the annuity fund. How does that necessarily follow, as opposed to, well, maybe it follows. I don't know, you'll have to go back to the district court and ask what those payments were for. I mean, I can't answer the specifics of that without it being remanded and we go through each check. What I can say is that these expenses- And I appreciate that answer. How is it that we can then conclude that you have borne your burden of prejudice, right? Because the burden is not to show that maybe your client's substantial rights were violated. You bear the burden, not the government in this case. Had you preserved that argument, and I understand maybe you would have an ineffective assistance claim you can make on habeas to say the lawyer should have and that was crazy not to, and then that may be different. But at your point, you have the burden of showing that your client's rights were burdened, that he did overpay, or he has been ordered to overpay. Not that we just don't know, Your Honor. Maybe it's fine, maybe it's not. We just don't know because these attorney entries are just big question marks. I guess, Judge, you look at the indictment itself. It was their theory from the beginning, and I think specifically page 44 of the appendix, it's approximately pages three or four of the indictment. It was their theory from the beginning that there were going to be expenses for the benefit of the union that were transferred out of this annuity fund. It would be at best a guess to say that the 529,000 was actual loss. Their theory was based on the idea that this money was going to be going towards the union member's benefits. And I think it's fine. So we have a prohibition on using the annuity fund funds for the benefit of the union, right? So let's say all of the misappropriation, all the misappropriated funds went to the benefit of the union. And you're saying the district court could never award restitution because even though that was a violation and a misappropriation of money, it ended up benefiting the people who were also beneficiaries of the fund? No, no, none at all. So I give you a list of half a million dollars of appropriate expenses, that I'm, Judge, that I'm saying are appropriate expenses. What has kept the- Actually, your argument is not that it actually benefited the members of the fund. It's actually, your argument is that they were permissible expenditures. No, for restitution purposes, it is that it's beneficial to the union members. We are also saying that it was consistent. You just have the two arguments. Okay, so for restitution purposes, you're saying it's because it benefited fund members. But get- So if we had a case where all of the money just went to help the union and there's overlap between the fund members and the union members, you're saying you just couldn't have a restitution award. Because even though there was a violation of the law and a misappropriation of money, it ended up helping the same people that the annuity fund was meant to help. They'd have to establish- But the whole point of the law is that they're supposed to be benefited through the annuity fund, not through the union. But for restitution purposes, they have to establish that the money was wrongly spent out of the operating account. Just moving the money from the annuity fund to the operating account doesn't address the issue of what actual losses under restitution. But again, you're saying maybe, maybe these things were proper administrative expenses. That the union was allowed to basically charge administrative expenses for running the annuity fund, right? To answer that better, Judge, and I should have answered better before, it's consistent with the director from the controller. No, I get that, but isn't that the whole point of the directive in your view? That hey, the union is running this annuity fund. They get to bill the annuity fund for their expenses. And then it seems you're saying is because maybe one of those permissible administrative expenses could be for hiring lawyers. Anytime that we see a check entry out of the union account to a lawyer, because that is of a type that could be a valid expense, it's fine. And that seems highly speculative. Maybe the union is spending it, I don't know, say the union is negotiating the lease on its space. And it's hired a lawyer to do that. Well, it's going to pay the lawyer. But that doesn't, we're down to the benefit of the annuity fund. It's not an administrative expense of the annuity fund that's reimbursable, right? But this is why we call it, this is why we argue that it was ineffective for this not being addressed below. And it leaves us with these questions. Can I pivot to that because we've kept you up? Yeah, please do, Judge. And I think the key question I would like you to focus on is, why is this not appropriate just to put to a 2255? It seems to me that there are a lot of factual questions here about what was the medical condition of Mr. Goldster? What are the particular questions that you would argue ought to have been asked on cross-examination or motions that should have been made? I don't even understand how we could decide this on a record. One way or the other, that's before us on appeal. So my understanding is that the only difference between remanding it at this point, which would effectively allow you or whoever in the district court to then, I suppose, file a new Rule 33 motion for a new trial, alleging ineffective assistance, or allowing your client to file a 2255, is that if he uses the 2255, he'll use up his first 2255, and someday in the future, if he hypothetically comes up with a new claim that he can't think of for a year, he won't be able to use a second or successive one, then isn't that always going to be true for any case that we kick to habeas? And how would your case be any different? It sort of seems like it's a contradiction in terms to imagine that he needs to keep his 2255 in case over the next year you can't think of a new claim that he's going to think of later. That would just undo Massaro. We would never send anything to 2255, but that is the default rule. So help me understand why that logic of not making him burn his first 2255 is a reason not to move it to 2255. Sure. So, and we cite, and I see I'm over, but we cite to Leon, which I think was probably the first published decision after the 1996 habeas statute came out, and perhaps that's why it caught everyone's attention that Leon addressed a simple situation, just a claim of ineffective assistance, and I think the logic of this court was, well, it's so simple, why make him use under these conditions? But as a general matter, under Massaro, we do. Well, hang on a second. I thought we have repeatedly followed Massaro and say that is the default, and only in exceptional circumstances do we send it back, and it cannot be that the looming possibility of a procedural obstacle to someday bringing a second or successive is in fact itself an exceptional circumstance, because otherwise we would not have the default rule. So explain to me what is the exceptional circumstance such that a remand is more appropriate here, aside from the possibility that someday he's going to think of another claim that is, I mean, presumably you'd go back and represent him, I assume, on 2255? I don't know that, Judge. Okay, well, whoever it is, presumably he's going to be a very competent lawyer. Yeah, so it's the extraordinary circumstances of this case. The idea that an attorney collapses during jury selection, and I know you know the facts, but- Well, I think that's the reported strength of the merits of your claim. You're obviously arguing in the government disputes that you think you have a great and unique and very powerful claim, but I don't think that we've ever said that our choice between remand and 2255 is based on our assessment of how strong the claim is, because there is no procedural default that you will suffer by looking at a 2255, right? You don't have to preserve this, an effective assistance claim, even on appeal, and of course you have. You have preserved it. But I would- We're not in the world of Billy Echo from 20 years ago or 30 years ago. But I guess what I would say, Your Honor, is that these are such unique and extraordinary circumstances that it's, in effect, a waste of judicial resources to even go through- But so if we agree with you that it was per se ineffective because the lawyer was suffering from a degenerative brain disease, then it would be simple enough to resolve on direct appeal. But if we did not agree with that and thought it required an extensive inquiry, then maybe it should be, it's more appropriate for a 2255, right? If you agreed with that, I think, but I don't think it is a complicated thing. There's two things that you'd have to address on remand. Number one, that it would confirm that he had CJD, and then number two, you asked the question, is this analogous to Tippins? Is this the situation where we're not going to apply that varied assumption from Strickland that each attorney is mentally competent before us? Yes, Judge. And you said that it's, I can't remember your phrasing, but why would it be procedurally easier-  Or less burdensome to do it on remand as opposed to a 2255? It strikes me as identical. Either you're going to file a Rule 33 motion, right, making all your allegations, or you're going to file that, and the caption you put on on the top says, motion under 2255, but the content is going to be identical, no? Well, to that, but if the court-  But if the, I agree, Judge, but if the court ordered a hearing, there'd be no point to even have pleadings. The point is, this is going to end up in a hearing if he did- But if we don't issue an order, okay. That would be- You're saying that you would, in a 2255, you've got to ask the court for a hearing, and you're asking us to direct the court exactly how the proceedings should map out in your favor on remand. Okay. Two parts to the remand, yes, Judge. Got it, I see, I see. I appreciate the extra time, Judge. No, I, yeah, that's very helpful. All right, Mr. Jacobs, why don't we hear from you about Mr. Brown? I'm sorry, do you want me to sit in the back, or should I sit in the front? No, I'm fine. Thank you, Your Honor, and may it please the court, Brian Jacobs on behalf of Andrew Brown. I represent him on appeal. I didn't represent him below. This court should reverse Mr. Brown's conviction, because the evidence was entirely insufficient to prove his intent to defraud. The government gives five reasons, or five pieces or categories of evidence, that the government submits support affirmance here. None of them hold up under scrutiny, and I'll take them quickly in reverse order, because I also want to address the need for a new trial based on misjoinder. First, the government talks about how Mr. Brown had a strong financial motive. Those are their words, strong financial motive. But Mr. Brown's forfeiture here was $3,000. His gain was a single $3,000 commission over a nine year fraud scheme that he supposedly participated in. Does he need a strong financial motive? It's up to the jury to decide whether he had a motive, and then it's up to them to decide whether it was strong enough that they think that was something that drove him subjectively to do this, right? Yes, your honor, but the jury cannot draw inferences where the evidence supporting them is so meager that it is unreasonable, and the governments use the words strong financial motive here. And what I am rebutting or attempting to is their words, strong financial motive. The $3,000 Mr. Brown made shows exactly the opposite, that he did not participate in a nine year fraud scheme to help Mr. Winder loot this fund. Second, the government says that Mr. Brown knew that the fund was violating city regulations based on Mr. Brown's presence at a meeting where Winder was evasive. Mr. Brown's presence at a meeting where regulations are discussed shows nothing of the kind. It doesn't show his knowledge and intent, and these are complicated regulations. He's not a lawyer. What about the text messages where Winder said, I want to make a withdrawal for these reasons, like the Janus decision, right? And then Mr. Brown fills out the form and puts a different justification. I can't remember if it was administrative management cost. Yes, your honor. Not Janus, or at least a reasonable jury could have concluded that that was a lie. And then asked themselves, why would he lie about this, or did he do it purposely? And said, well, Winder told him to write X, and he obviously chose to write Y. So it must have been a knowing decision to lie about that. So why would a jury not be able to conclude, even from that alone, that he consciously decided to do this? He wasn't instructed by Mr. Winder to say, hey, I think it's the Janus decision, but I'm asking you to put down administrative cost for this benign reason. Your honor, I think that he does ask Mr. Winder for permission. The text message, there are two. One is at A754, and Winder instructs Mr. Brown, $60,000 and Janus decision, and make it for 2019 early withdrawal. And Mr. Brown checks administrative management. There's no evidence that Mr. Brown knows when he's checking administrative management, that this is not a permissible administrative management purpose. You look at the form- So I guess your argument would be, the Janus decision meant that the union was going to have more administrative expenses, because it was losing dues. And so Brown might have thought administrative expenses was a way to say Janus decision. Right, so that's true, but couldn't a jury make a different inference? I agree that that inference is possible. But is it so clear that it's impossible for a rational jury to decide that he was writing something different than he was told? A rational jury can't infer anything about Mr. Brown's intent from the fact that he receives this message from Mr. Winder saying $60,000 and Janus decision. And then he checks administrative management. I don't think that says anything about his intent. This is not a case where some cooperator said, these two got together and discussed this scheme and executed this scheme. I'm curious about getting your list of the five things. So the second thing was the known violation because he was at a meeting. I guess before you get to thing three, is that so clear that a jury can't make an inference? So he's a sophisticated party and he's at meetings where he should know that there were accounting problems. Couldn't a jury say, well, he must have known, and a failure to inquire, like he just sort of sitting there in ignorance is implausible. Is it so obvious that he kind of knows something fishy is going on, but he has no reason to know what it actually is? I think drawing that inference from the meeting the government's referencing is totally improper and beyond what the jury could do. Must have known, the words your honor just used are the very hallmark of a case where there is not actual proof of intent. He must have known because he was in a meeting. Whether the jury can draw a reasonable inference, I mean, that's different. That is circumstantial evidence. That is proof. What about the lying, the allegation that he lied to the union members and said, these withdrawals are to fight the city of New York in upcoming legal battles. And I understand there was evidence that there were no legal battles. Your honor, so that was my third and the government points to this one piece of testimony from this one union member, who incidentally had been discredited in an official proceeding and other testimony. The jury's allowed to believe him, right? Correct. Let's assume the jury believed the witness, which it's allowed to do. There's no evidence that Mr. Brown believed that statement to that union member was not true. And in fact, it's consistent with what Winder told him in the text message we were just discussing. About the- Again, I kind of agree with that, right? It's possible to say that when he says we're borrowing the money to fight legal battles, he's just describing borrowing the money in order to fund the union, because what the union does is it fights on behalf of the workers against the city or whatever. But again, is it totally irrational for a jury to say, well, he said that, and it doesn't seem to be connected to anything real. And so I think that that's evidence that he's misrepresenting the jury. Well, there needs to be proof of his intent, that he intentionally was taking money and property through false or fraudulent representations. And what this court said in the Connolly case that we cite and discuss is where the statements made could have been true. But there were no battles. There were no legal battles with the city, right? But in Connolly, it's like- Hang on a second. There were no legal battles with the New York State, right? So if he says something, and the government puts in proof that what he said is objectively false, right? Can't the jury infer, well, he had no basis to make that statement because it didn't happen. And therefore, if it couldn't come from reality, it had to come from his brain. He had to have made up the story. Why is that not a logical and permissible inference for a juror? I think the inference is that this is something Winder told him, not that this was something that he knew was false. So that could go to the conspiracy then, right? I mean, that could also feed into the government saying that if they're talking about it. But again, if it's disconnected from objective reality, and it sounds like there was evidence that there were no legal battles, then can't the jury infer, well, if it's not connected to reality, it's got to be coming from somewhere else, if it's false. Then, and coupled with all these other things that are disconnected from reality, why can the jury not start? I think it goes to- I don't think any of that goes to Mr. Brown's knowledge. He needs to not only have said it, he needs to have known it was false. And to say it's not reality, of course there are legal battles. Does he need to know or believe it's false? I'm sorry? Does he need to know or believe that it's false? He has to act knowingly and willfully, to actually have joined this conspiracy knowingly. It's not enough if he's simply negligent and not investigating. No, that's different, right? Knowingly joining a conspiracy is different from knowingly saying something is false, but you believe it's false. You could recklessly say, just totally make something up. It turns out that it's false. But as long as you're, I thought, for a fraud case, it's an intent to deceive is the only question. To the extent the government is suggesting he made this false statement knowing it was false, and that's evidence of his participation in the scheme to defraud, I think he needs to have made it knowingly. If he made it recklessly or negligently, I don't think it would actually support the sufficiency of the evidence here. So I think the fact that he may have said that, where Winder is telling him, Janice's decision and other things, I don't think saying there are legal battles that the city proves his intentional participation in the fraud. I'm going to get the three. So we have strong financial motive, knowingly violating the city regulations, and three was the fighting legal battles. The testimony from the union member that- Okay, so what's four? So four is that the government points, and this is in their brief, it's number one, his role, which is checking the boxes on the forms. There's nothing about that role that indicates knowing and intentional participation. He checks administrative management on 17 of the forms. They're in the appendix. The fact that he plays that role at Winder's direction doesn't show intent. It is, there's no- The fact that he merely plays the role, the government points to, you know, the assumptions from a census that you're supposed to provide as much explanation as possible. And then the government says, well, he's giving these very brief cursory general explanations, and so he's not following those instructions, and maybe that shows an intent to deceive. Is that possible? Can the jury make such an inference? No, your honor. If you look at the forms, and there's one on appendix 627, it's check boxes. And, you know, record keeping, plan termination, third-party fees, other, and then you can say administrative management. There's a single line, a tiny line where you can write it. This is not a form calling for, you know, attach an explanation of several sentences. So I don't think that the role in writing the forms supports an intent to defraud. So that's fourth. And then the final is the text messages, which we talked about. And there are two of them. One is Winder's text message to Mr. Brown saying $60,000 in Janus' decision. Again, that's Winder's instruction. It does not prove Mr. Brown's intent. In the other, Mr. Brown says, I need to do the withdrawal to pay the standard. This is the insurance premium. I'll write audit as a reason. And then a couple weeks later says to Winder, can I do an admin withdrawal from a census to pay the standard? So he's asking Winder if he can do an admin withdrawal to authorize this payment. That text message, or these two text messages, one from Winder and one from Brown, doesn't support an intent to defraud, a participation in a fraudulent scheme. I think the evidence here was exceptionally weak. And the conviction, I would submit, is attributable to spillover prejudice from the Joinder issue that I'd like to turn to briefly. The indictment charges a wire fraud scheme and then has a series of tax counts against Winder alone, where Winder fails to file his tax returns. Under 8A, which applies in single defendant cases, it is entirely permissible to join offenses of the same or similar character. But in a case with multiple defendants, like this one, you have to follow 8B. And under 8B, it's not enough if the offenses are of a same or similar character. They have to be the same acts or conduct part of a common scheme or plan. And I need to pull out my language. Here it is. I apologize. It has to be the same series of acts or transactions. And here, the government says to this court that that's satisfied because the money that Winder obtained in the fraud scheme was the money he didn't report in the tax counts. And that would be sufficient to justify Joinder here under 8B if it were alleged in the indictment. But it's not alleged in the indictment. Yeah, his argument is it's not alleged in the indictment. And also, I mean, I guess that's just as a practical matter, if Winder's just not reporting his income on his taxes, it's not totally obvious that engaging in a fraud to prop up his employer is part of the same scheme. He probably would be cheating on his taxes anyway. Correct your- So I get that. But then I have a question about prejudice. So even if there were a separation of the tax counts, you'd still have a joint trial on the fraud counts, right? And it seems to me the stuff that's prejudicial to your- that's purportedly prejudicial to your client is that it's more obvious that Winder acted with the requisite intent, right? And so that's prejudicial. But why are the tax counts- like having a trial on the tax counts prejudicial? In fact, the fact that your client is not charged with the tax fraud allows you to say to the jury, like, look, you know, Winder is the one who's profiting from all of this, and my client didn't really have the motive to engage in this, and so he should be treated differently. But if you didn't have the tax counts, you wouldn't be able to say that. So why does it prejudice you to just the tax evidence? I understand, Your Honor, and I think there's significant prejudice. And I want to point out just- first, it's their burden to show that it's harmless. It's not our burden. In this instance, Shalef is very clear that it's the government's burden to show harmlessness. So let's say that argument is, well, look, anything that's prejudicial is on the fraud counts. The tax counts, it's not. So four reasons. One, almost a third of the government's witnesses, four witnesses related to Winder's tax crimes alone. So the jury was hearing extensive evidence at trial about Winder's tax crimes. It dominated a significant portion of the trial. Second, the government repeatedly links my client, Mr. Brown. You describe- they describe my client, Mr. Brown, as Winder's right-hand man. And defense counsel describes my client, you know, falsely, erroneously as Winder's tax advisor. As the- I get how that second thing is a problem. I definitely get how that second thing is a problem. But why is the first one a problem? Because they were charged in a conspiracy to engage in this fraud on the audit or the annuity fund. So are you saying that had they always said, he was his right-hand man, parentheses, with respect to the fraud. I mean, did they always have to have that kicker every single time? The problem here, Your Honor, is that a failure to file a case and the evidence of it against Winder was totally overwhelming. Someone files their taxes or they don't. And when someone has not filed taxes for four years and that person is the person you're sitting next to at counsel table, the risk of spillover prejudice is enormous. This court cautioned against exactly that kind of spillover prejudice. Well, can I ask you this? What about the allegation, the indictment, that Brown agreed to enrich Winder with the proceeds of the fraud through cash and checks? Let's say there had not been joinder of the tax accounts. Would the government have been able to put in evidence that Winder was doing all sorts of things? Spending money on one woman in songs and not filing his taxes and all these things that were aimed at proving that the goal of the conspiracy was, in fact, to enrich him? Why wouldn't that have been permissible? Well, a couple reasons, Your Honor. First of all, I think there would have been an objection based on 403 that there's unfair prejudice from that evidence. No, I get that. I get you would object, but I'm saying why wouldn't that have been an objection that could have been overruled? It could have been overruled in the context of a joint trial, but the question is whether on this record we have, is there- No, my point is that you're saying that the prejudice arises from the joinder of the counts. And I'm saying, well, isn't it possible, and you can tell me if you disagree, isn't it possible that this evidence could have been permissibly admitted even if there hadn't been joinder of those counts, given the indictment's allegation that one of the purposes, that is, charge against your client, was to enrich winder? I don't think the evidence would have come in, but even if it did come in, I think the prejudice was still significant because the jury's actually being asked to decide five failure to file counts against winder where the evidence is overwhelming. And it just is very different when that evidence is being offered merely as 404B support for fraud counts against winder. So I still think there's prejudice. Why is the jury being asked to decide? Why does that create the prejudice? I mean, if the jury is instructed that the tax step applies only to winder, and we assume the jury's following instructions. So it's gotta be the presence of the evidence, not the role of the jury that creates the prejudice. I think that the presence of the evidence in order to prove up the claims is much more extensive than what would properly come in on a 404B analysis, especially as constrained by rule 403 in a trial that's just on the fraud counts. So what exactly is this prejudice though? I mean, what is the nature of the thing the jury would be misled into thinking? That winder is such a bad guy, we should punish Brown too? I think that characterizes prejudice in all contexts. Where the decision- So why would it be, though, the opposite to say, wow, here these guys are. They're both committing this fraud. Winder, though, is cheating the tax man. There are no such charges against Brown. If the jury's going to speculate, they're going to say, well, at least Brown must have paid his taxes, because there are no charges. I mean, if we're going to start imagining what the jury must have been thinking, why wouldn't that be the thing that's favorable to your client, that he is less culpable in that particular way? I certainly understand the argument your honor's spelling out, but I'd say that this court's decisions about spillover prejudice, talk about spillover prejudice in the sense that I'm articulating, where the spillover prejudice of sitting next to someone who's being tried for unrelated counts on which the person's overwhelmingly guilty creates a genuine and serious risk the jury will find my client guilty too. Those decisions don't speak in terms of, well, maybe the jury will find my client innocent because they'll see just how bad the other guy is. Usually being associated with someone who's particularly bad results in a jury reaching, or at least risks the jury reaching an impermissible decision. It's a classic Vanity Conspiracy case, the lowest guy in the totem pole gets acquitted, right? So, I mean, that's a classic scenario too. So, I don't know, do we have any further questions now? because we've kept you up considerably past your time. You've kept a minute for rebuttal, why don't we hear from the government? Thank you, your honor. And even though this wasn't raised, I think it's incumbent upon us just to ask, the discovery issues were quite upsetting. And I think justifiably so to Judge Castell, and I think it would be helpful if the government could just put on the record some of the steps it's taken to ensure that those mistakes don't occur again. Could you just explain a little bit? Sure, your honor. First, I'm Andrew Robach for the government, I'm empty of the court. Just in direct response to your honor's question, in response to Judge Castell's order, the government filed a letter. It's largely sealed because some of the information about how the government obtains and processes information is confidential government information, but I can tell you that this- At a high level, just explain to us, assure us, assure the court that as I'm sure has happened, the government has taken concrete steps to ensure that these missteps don't occur. The government has taken very concrete steps, your honor. Among other things, the government now has an entirely new system for logging and tracking evidence that comes into the United States Attorney's Office to ensure that everything that comes in and is discoverable goes out the door also to the defendants. That's one example of many, but I can assure the court we take this very seriously. That's fine. You can move to whatever point you were planning to leave with. I thought I would begin with the sufficiency argument, your honor, regarding Mr. Brown. And I'd like to direct the court's attention to the text message and email chains related to the payment for the standard life insurance. A particularly critical text message is the message in which Brown asked Winder to pay the bill for the standard life insurance. And he says to Winder, quote, I'll write audit as the reason. This piece of evidence shows several different things. It shows, first of all, that Brown is aware that if they submitted a form that simply said to pay life insurance bills for union members, that would not be a proper expense, census would deny that request. So they had to manufacture- Wasn't he paying the bill because the union's own funds were tied up in an audit? Isn't that, is that why he says audit? He actually, no, first of all, there's no specific record evidence about that. But the evidence in Governing Exhibit 2101, and the email, sorry, the email chain with the standard itself, which is not Governing Exhibit 2101, describes how they, this is a point in which the city has withheld payments to the union's welfare fund and audit fund because of their lack of compliance, so- Yeah, but the city's withholding the funds because it's tied up in an, they're auditing the accounting of the funds. Well, they've withheld the funds because the union has not complied with the audit. And so because they failed to comply with the audit, the city has sought this relief. So there is- I think you're saying audit is obviously a lie because it's that they're not complying, it's tied up because they're not complying with the audit, not because there is an audit. Is that the distinction? No, audit is a lie because what they wanted to use the money for was to pay an impermissible expense, pay a welfare fund benefit. Which Mr. Brown knew- Right, but the whole argument is whether he knows that that's an impermissible expense, right? Yeah, so there are a variety- So it might be that he thinks that an audit that ties up the union funds is a reason why he can draw on the annuity funds to pay the bills. It doesn't show that he's aware that that's an impermissible offense, the fact that he just writes audit. Because there is, in fact, an audit that is tying up the union funds, right? I mean, I suppose if Mr. Brown's view were that any union expense becomes permissible because the union is not getting money from the city because of problems related to the audit, then that would be true, but- I think that the argument is that he doesn't understand, like, he didn't know that it was impermissible to draw on the annuity fund in order to fund expenses of the union because his view was it's all administered by the union and, like, you can, you know, borrow against the union funds. And so the idea is whether he was aware that he was being fraudulent when he made the requests for withdrawals. So there are a few- And there is evidence that he didn't hide the fact, right? Like, he didn't hide it from the standard. He, like, told them, you know, I'm going to draw on the annuity fund. And he even says the union has a right to do that, and then he's going to pay it. He doesn't hide it from his employees. Well, he- And so I guess, you know, it's not obvious to me that just saying the word audit shows that he doesn't- that it's not his belief. I mean, I guess a few things about that, Your Honor. First of all, what he says to the standard is that he's taking money to which the union is entitled from the annuity fund. And so that the standard has no reason to think that there's anything improper about that. Unions are entitled to take money. Well, the standard doesn't know, right? So he says, we're expecting the NYC welfare deposit to hit any day, however, as a hedge. And per Kenneth's instructions, I transferred administrative fund for which the union is entitled from the union-sponsored pension plan. So, like, he's not, you know, he's not shy about that, right? It does seem to believe he thinks it's permissible. And he's- what he's trying to do in that conversation, in that email, is explain to the standard why the money is not already there and why they have a plan to insure itself later. I guess just my thought is, if he was aware that that was illegal, probably he wouldn't just say that that's what he's doing, right? Well, he's crafting a legal version of an explanation, which is not, in fact, what he's doing. Because what he's actually doing is taking an impermissible expense that is for the money for the standard to which the union has no entitlement at all, and using- But you're saying he's wrong. The legal conclusion is wrong. Well, he's wrong, and he knows he's wrong. That's why he's writing on the form audit and not pay permissible union expense for life insurance due to audit or something like that. All right, so there's the audit evidence. So there's the audit evidence. There's the evidence about the lies to union members. And there are two different union members, but the court should assume that the jury at least credited the one that they've been talking about. But there's evidence in the record of a second union member to whom he told the money was being used for legal battles with the city. And what's particularly critical there is that when he's confronted by a union board member, Yolanda Moore, about this, he denies having said that to the union members, and he instead gives a permissible reason. He says he thinks it could be that this money was taken for an audit of the annuity itself. So he didn't just say it was taken for, because of what's happening with the audit or some other purpose. He comes up with a permissible explanation to the board member, because he knows that if he came up with an impermissible one, the fraud would be found out. And the jury, in your view, had the right to credit both of those witnesses, and determine that, in fact, yes, he had given inconsistent answers, and that his giving a more permissible reason to someone who would have been in the no It shows that he was trying to cover up the improper reason that he gave to the union member. One is a witness, and one was a text message, but yes, your honor, that's correct. To give you another example, the chain around the time of the first withdrawal, to which the defense points at the 2012 email chain, which is government exhibit 334 or page 572 of the record. When a census says, what are these expenses for? You're not supposed to take money out of the annuity fund. He does give a list of permissible expenses, but he frames almost all of the ones in the list around benefits to the annuity fund itself. And so he does reference legal fees, but he doesn't just say, we can take money from the annuity fund to pay for lawyers. He says, our lawyers who are going to quote, provide advice pertaining to this account. So that's now two pieces of direct evidence the jury could rely on, where when confronted by someone who does know the rules, he recites the rules in order to ensure that the money is withdrawn in a permissible fashion. So then when you read the text message about the audit and taking money for the standard in that context, or the text message about Janus, which becomes the administrative withdrawal in the context where he knows what the rules are, then the change becomes very powerful evidence of his fraudulent intent. Because then you see he's not just an ignorant person who is sort of trying to come up with a simple thing to write on the form. He knows what the rules are and he's intentionally deviating, or he's intentionally lying to the census. So you suggested to Mr. Jacobs that maybe that's an inference the jury could make. But it's also possible that Janus is shorthand for the idea that the union has more administrative expenses because it has less money in dues. And so saying administrative expenses is actually a way of writing Janus' decision, right? It could be that he thought that, but it would be very convenient for him to have reframed Janus' decision to a thing that he also knew would be palatable to- It's a checkbox form, right? So he didn't come up with administrative expenses. He checked. Actually, that's not correct, Your Honor. It's a checkbox form, but then there's a blank at the bottom. So he could have put in the other thing, but if he thought that Janus was shorthand for increased administrative expenses, it would have made sense to check the administrative expenses. No, he wrote onto the form administrative expenses. So that is the critical difference. And actually, another fact showing his intent, Your Honor, is that it is not simply a form that you fill out and you write onto the form. What the reason is, you're expected to attach an invoice to each form showing the expenses, because it is not a small thing to withdraw from city employees' pension plans. And what is striking in this case is that every single invoice that was submitted to a census was created by Mr. Brown. So when there are audit expenses, you do not see a form that says this is for the audit and an attached bill from the auditor to withdraw the money. In each case, Mr. Brown manufactured a form in order to attach an appropriate invoice to get the money out of the census. So those are a few reasons, Your Honor. That- Could you turn, because we've kept you for a while, I don't want you to use all your time on this, unless you want to follow up on this. No, that's fine. I was going to ask you if you could turn to the restitution issue that applies to both of the defendants, although it was Mr. Murphy addressed it in his presentation. Of course, Your Honor. So our view is that the $529,000 is certainly a reasonable approximation and absolutely not a plainly erroneous one. That is the loss to the annuity fund members from the fraud itself. The reason that there isn't a good ability to distinguish between the legal fees that were used for annuity fund members and legal fees that were used for some other union purpose is that there was no expense sharing agreement, which is the type of agreement that is expected in order to distinguish these sorts of things. Mr. Winder was told by his auditors that he needed to have such an agreement under Directive 12. He never did such a thing. If there were an expense sharing agreement and it were possible to distinguish the legal fees that went to the benefit of fund members and those that went to other union members, should that add up to the restitution amount? If there were, and it could be shown that those were paid with improperly withdrawn funds, yes, we would credit against the restitution amount. You're saying that the same people who were beneficiaries of the fund were also beneficiaries of the union, that you think that that's a meritorious argument. You just think it's impractical for the, there just isn't enough evidence for the district court to discount the restitution award by that amount. No, Your Honor, we don't think that. Just, I'm sorry if I was unclear. If there were a legal fee bill that related to the functioning of the annuity fund, then that could be offset because that bill related. So what about the argument that the beneficiaries of the fund are also beneficiaries of the union, so they got a benefit from the expenditures? So that argument is incorrect for two reasons, both of which are on the record. They're just not overlapping sets. One is that the evidence on the record is that only two of the three LIBA collective bargaining units participated in the annuity fund. So there was another collective bargaining unit that would benefit from expenses paid for the union, but that was paid for by the other two bargaining units members who were participants in the annuity fund. The second is that after the Janus decision, which there's not very much record evidence of this. It's really only the text message about Janus. But after the Janus decision, there were people who were employees of, for instance, the sanitation department, who were beneficiaries at that point of the annuity fund, but were not within LIBA. And so if money was spent on a union expense from the annuity fund, non-union members who were beneficiaries of the annuity fund were not. I guess my question, just because I'm trying to get at the principle, like if, let's say that the overlap was complete. Let's say all the beneficiaries of the annuity fund were also members of the union. Would it be correct that spending money on union expenses that then benefited them as members of the union should be taken, discounted from the restitution award? I still think the answer would be no, Your Honor, because the annuity fund is supposed to be money held in trust for these union members' retirement. And so- It doesn't really matter. I mean, I guess if we thought it mattered, that's why you're making the argument. But you're saying it shouldn't really matter about the overlap. You're saying it's just always inappropriate, even if they are benefiting in their capacity as union members. It doesn't, the whole point is that they should be benefiting in their capacity as fund members. That's correct, Your Honor. I think it would be a little bit of a harder case, which is why we make the other arguments, and in case you disagree, but yes. Because they're raiding their retirement fund. I mean, I take it you'd be making the same argument if the defendants had taken all this money out, lied about it, and then thrown a giant, elaborate dinner at a fancy restaurant in New York and said, there's been a windfall. New York has sent us all this money, we're all invited to have this fantastically expensive $2,000 a head dinner. And it's only the annuity fund members come, and they all have a delicious dinner. And they were told it's not from your annuity fund, but they had secretly, the defendants had secretly withdrawn it from their retirement funds. You would be arguing, I'd take it, to say, well no, the annuity fund members still deserve restitution, because this, even though eventually was somehow spent on them, it was taken deceitfully from their retirement fund. That is correct, Your Honor. Even if they benefited in some other way, it's still stealing from their retirement fund. That's correct, Your Honor.  Sorry, can I ask about, sorry. No, no, go ahead. I was going to ask about the Joinder question. Yes, Your Honor. So you say the case involves a classic fact pattern in which revenue at issue in tax accounts arose directly from a scheme charged in fraud counts. But, first of all, that's not alleged in the complaint, or in the indictment. And, you know, isn't actually what happened, he's just cheating on his taxes in general. And it's true that he's engaging in a fraud that props up his employer, so he's going to get income if it doesn't go insolvent. But it's not like the specific funds that he's getting through the fraud are the ones that he's not reporting on in his taxes. I guess there are two questions embedded in there, Your Honor. One is not in the indictment, and the other is. Yes, those are two questions. Okay, so if I can take each in turn. The court, this court has never held that it has to be specifically alleged in indictment in that way. Shellef and Turov talked about common sense understandings of the facts alleged in the indictment. Right, that's why it has two parts. And so then my common sense inference is what it looks like is he's just cheating on his tax, not reporting his income, and cheating on his taxes. And he would be doing that regardless of whether there was fraudulent transfers to his employer, right? So a few responses to that, Your Honor. First, we think that at least significantly some of the income he's getting, and which he's cheating on his taxes, is income like the Lexus payments that the union is paying for his car, checks and cash he's taking from the union outside of his payroll system. So it's not just he had a salary from the union, and that was funded for by an insolvent account, and he would cheat on his taxes no matter what. The financial flow here is somewhat more intertwined. But also this court has- You're saying that that suggests that actually he wouldn't have had all of the money that he failed to report but for the fraud. That's correct, Your Honor. That's like the Lexus payment and whatever, even if he was also not reporting other income that he would get normally as an employee of the union. Yes, and in fact, his income, the evidence is that his income increased significantly once the fraud began. That is to say the amount of money he was taking from the union. My other answer is that that's just simply not something this court has ever required, some tighter factual connection than what we've alleged. That is, in Little, for example, it was enough that the money that was the sort of subject of the other offense flowed into an individual's bank account, and then that is the income that was used not to pay his taxes. So it's up to the indictment to decide whether it's a one scheme, right, because usually you decide this at the outset, right? So why shouldn't it matter whether it's alleged in the indictment? We think it is alleged in the indictment. It's just not alleged in the specific words. The money was the same. The money which he obtained through the fraud- Oh, you're saying if you look at the fact that he's not reporting his income and the idea that his income is increasing because of the fraud, then you can see that he's not reporting the income obtained by the fraud. The idea is really sort of three different things. One is that the indictment alleges in paragraph five that the union was insolvent and so could not have been funding itself absent the fraud, and then he's getting paid by the union. A second is that some of the means of payment, the means of the fraud described are like the withdrawals of excessive cash and checks, is a phrase in paragraphs five and six of the indictment, and that is the same means by which he is paid in paragraphs 21, 22, and I think 25 of the tax crimes. And then the third is that an objective of the fraud counts is to enrich Winder, which is the same objective as the tax counts, which is also to enrich Winder. And in fact, him being enriched by the fraud gives him income he can then fail to report as a taxes. I get that argument. I mean, the district court said this thing about, well, it's foreseeable if you engage in a kind of wire fraud that one of the conspirators might not report it on their taxes. If that's what all it was, would that be a sufficient connection? I don't think so, Your Honor. The district court said that just in response, that notion first came up in the district court argument in response to an argument defense counsel there was making that Mr. Brown had no knowledge or interest or role in the tax crimes, and so the district court said, well, it's foreseeable that if you have a co-conspirator, this would happen. You're saying that's not the reliance, that's not the principle that governs the jointer. That's correct. If it were in fact based just on the foreseeability, that would be insufficient. You would rely on this argument you just described about what the indictment alleges. That's correct, Your Honor. I guess one more just about the prejudice question. When we think about the prejudice question, should we think about this idea that actually maybe it did make one co-defendant look worse that he's being charged with tax crimes than the one who was not? Is that relevant to the prejudice question, or do we just look at whether there's prejudicial conduct alleged that kind of could spill over to the other defendant? I think it's a thing the court can look at. I don't think the court has to sort of close its eyes to that possibility, but it is more about whether there's evidence or argument or something like that that would provide substantial prejudice to the defendant. Okay, so if the argument to the jury is this is Winder's right-hand man, and then the jury gets all this evidence about how he's a tax cheat and so on, doesn't that make it more prejudicial, there would be spillover effects? Not here, Your Honor. There's a bunch of reasons why this is not a case where the court should be worried about that. One is that the government was very clear in its summation to distinguish the tax counts from the rest of this offense and said things like, the tax counts are against Winder only, I think is the phrase the government used twice in its closing. There was an instruction by the court, which we assume that the jury followed, that it should consider each defendant separately as to each count. That was also, of course, a theme in the defense closings. And the defense was invited to propose a stronger limiting instruction if they wanted one, and they never did so. But there was an opportunity if they felt like more was necessary, and to cure the prejudice in the district court. Can I ask you to turn your attention to the ineffective assistance claim? And I was a little confused by why the government's lead argument is that we should reject outright the ineffective assistance claim now. I totally understand the idea of sending it to the district court to consider on 2255. But do you really think that there's enough now that we could adjudicate it in a definitive way? Even though, hypothetically, if there were a period of time when the defendant could collect evidence, he could amass information from doctors, testing that actually unbeknownst to the court now, there were any number of neurological tests showing that during the trial, Mr. Golter was failing all sorts of cognitive tests and all sorts of things like that. I mean, I can envision an infinitude of factual possibilities that are simply not on the record before us. And I guess I'm wondering, given that there has never been such a proceeding to collect the facts and have them for the district court, why you would ask us to actually adjudicate this in anybody's favor now? We understand that's the default rule and we are often up here making the argument that we need a factual record. How could we say no? Because nobody's ever collected any facts, nobody's ever made a motion before the district court. How is it that we're going to adjudicate this and say there is, because we'd have to basically say, there is no set of facts, there is no evidence that you could ever produce, ever, to show that there was an effect of assistance here. Because I don't understand how there is no such set of facts. Our view is that the court can reject the per se argument based on its prior decisions. And that's fine, but that's not adjudicating the claim. That's just saying that he can't win it here based on an incomplete record. Right. But you ask us to actually rule that he loses. Yes, Your Honor, and then our view is that his briefing here, which he's had ample opportunity, it's really the vast majority of his brief here. Because we're on appeal, right? I agree, Your Honor. If I can just finish, our view is he is, with this ample opportunity to brief, he has not identified a particular item of prejudice that he suffered, not a witness who should have been called. Why does he have to do that on appeal? Well, now that he's had an opportunity, if he wants this claim to be addressed, he has now developed this record before the court, and the court could say, we've reviewed this record, and rather than have a very complex evidentiary hearing below about the health of the defense lawyer, it is clear that even if Mr. Bolger had been- You're saying we can determine prejudice- Yes, Your Honor. Here, even if we can't decide deficient performance, because we don't know enough about the medical records and all that sort of thing. You're saying we could, as a matter of law on this record, decide, no matter how complete defense counsel's mental deterioration might have been, there's no way to establish prejudice, okay. I mean, that's all right, but we, you know, think- You're saying we could decide deficient performance because they've scoured the record and tried to identify what was prejudicial, and you're saying it's just not convincing. That's correct, and we think that could be, there's a real efficiency. Given that he's fully briefed it and the record is before you, and the hearing, and the 2055 hearing would be extremely complex, this may be a case in which the court may want to simply resolve it here. I think you probably would agree that if, in fact, we thought that any evidence that a lawyer had of degenerative brain disease was per se an effective assistance of counsel, that might be a straightforward enough question to address on direct appeal, and so maybe we would address that. But if there were some factual questions, if the question depended on factual development, then it would be appropriate to- The answer would be yes, although we very strongly disagree with the premise there that- You disagree that it is per se ineffective, but if it were, like if it were, then it might be a simple enough thing to resolve, as opposed to waiting, right? And that it only required a featherweight of evidence, which I took to be an important part of your Honor's hypothetical. If there was any bar to how much evidence there needed to be, or the periods during the trial at which the person had to be suffering from the disease or something like that, if that were the court's rule, then there would need to be an evidentiary hearing. So you're disputing that he has the condition? We think the court doesn't really need to decide that at this time. The court should either decide that on the developed record- Well, if it were per se ineffective, it would matter whether he has a condition, right? Yes, it would matter. So do you agree that he had the condition when he was engaging in the representation? I have no basis to know. I just know what the defense is.  That would be a fact question. All we know is that he passed out during jury selection, and then we know when he died. And then we know, I think you're not disputing that he had the condition at some point, and that's where he died from, right? I mean, that's not- I mean, that seems to be what was in his obituary, so we'll infer from that. There is some other evidence in the record. But backing up, I don't think that it's clear from the record when this condition started to affect him mentally, right? We just don't know. I mean, obviously, Judge Costell is expressing his view that he was a very vigorous and effective advocate. And we have, you know, in between when he passed out and the two months later when the trial started, he said he saw two teams of doctors. He certified that after talking to doctors, he was prepared for trial. When he later withdrew, he said it was due to a rapid deterioration, consulting with his doctors. So we have Mr. Goltzer himself handling these issues in a very professional manner in consultation with the doctors. But again, Your Honor, our point is we think the record is good enough here for you to decide that there's no prejudice, but we understand that this is also a situation which the court might want more. When did Mr. Winder report to the BOP? It was- I don't have that off the top of my head, Your Honor. But it's- it was late 2004, right, when the bail motions came before? So it's not that long ago, the bail motions, I think. That's correct, Your Honor. I remember that. Yes. And it was only after the bail motion was denied that he reported? Yes, Your Honor. All right. That's good. Anything else? No? Okay, we have your argument. Thank you very much. Mr. Murphy and Mr. Jacobs, we're going to take you in turn. We're going to try to keep rebuttal succinct, so you have a minute. Thank you, Your Honor. One comment that the government just made was about Bellamy. He's speaking, of course, at page 308 of Bellamy. This court observed there is simply nothing inherent in an attorney's illness that necessarily will impede a spirited defense most of the time. I guess I have two points on this. Number one, we don't believe that's actually the holding of Bellamy. We believe that's dictum. So I don't believe this precludes our argument. If we get to that argument on remand. Number two, it's easily distinguishable what happened in Bellamy. You may recall that in Bellamy there were a couple things going on. This attorney had ethical problems in front of the First Department. And he concealed his communications to the First Department with the trial court. And he concealed some other things. Bellamy made the argument that his deceit was analogous to the per se exception of being unlicensed. Because the premise of being unlicensed is deceit upon the court. I know that sounds convoluted. This court rejected it. It was an alternative argument about his illness. Bellamy's attorney had a motor coordination illness. This is completely different from CJD, which of course punches holes in the brain. And I know your comments about the remand. Just one last comment, though, about what happened below. It is true that we had him passing out. He then reported what was going on with his doctors. But I also remind the court, I know the court knows, August 3rd of 2023, he informs the court two months after the verdict that he had been in the hospital for a week. There was a brain scan.  And he cannot competently represent my client going forward. And the last point, at sentencing, which was actually a year ago today, counsel around 1942 or 1943 of the record, points out that he talked to people that observed the trial. And at the time of trial, he had an illness that kept him from properly representing. And we know who that is that he talked to because she was sitting next to him. That was associate counsel. I appreciate you giving me an extra time, Judge. Thank you very much, Mr. Murphy. Mr. Jacobs? Thank you, Your Honor. And I want to briefly address some things Mr. Rohrbach said, and I'll try to be quick. First, Mr. Rohrbach suggested that the indictment doesn't need specific allegations to justify Joiner under 8b. I think this court's decisions in Turoff and Schellef say the opposite. They say that some overlap in the charges is not enough. You need what Turoff calls a key link between the charges. And 8b itself says you need the same series of acts or transactions. So it's not enough just to zoom out from the indictment and say, oh, well, maybe some of the fraud proceeds didn't get reported. Where the indictment doesn't allege a key link, it is defective. And as to the spillover prejudice, I think this is a textbook case of spillover prejudice. It's a case where it's weak. We heard that actually there was the key link in the indictment because it alleges that he's getting all of this extra income from the union based on the fraud, and we know that that's income that he's not reporting. So why isn't that the key link? It does not allege that he's getting this income from the union from the fraud. He gets income from the union because he's being paid by the union, and he changes the payroll system so that the payroll taxes don't go in. But the indictment never says that the money he's getting from the union is from the fraud. It is entirely possible with this indictment. I thought one objective of the wire fraud was to enrich Winder. He's enriched in multiple ways by the funds he's getting from the union, Well, by the fraud. We're not saying by the union. Like, oh, yeah, he was also getting a paycheck, by the way, while he was committing the fraud, but that he was being enriched by the fraud itself. He gets enriched both by the fraud and by the paycheck where there aren't deductions made for payroll taxes, and the tax scheme is one thing. The fraud is part of it, of his enrichment, it is alleged, no? Well, the fraud spans 2012 to 2020, and the tax spans 16 to 19. That's fine, but the indictment alleges that he was being enriched by it. But not at the same time. It doesn't say that some of the fraud proceeds are the money that's not reported, and I think that it doesn't say these are part of the same acts or transactions. On spillover prejudice in Litwack, this court found misjoinder where the government said the defendant was a cheat, a liar, and a thief in summation. Here they said my client was desperate for money when he's sitting next to Mr. Winder. I think there's clear spillover prejudice. On the sufficiency argument, just very quickly, Mr. Rohrbach referenced or said at one point that there was no evidence that the funds were tied up for purposes of paying the life insurance premium, but the text message that Judge Menasche read says that the funds are tied up. It's the very next test message in the chain. I get that. What about the point about, you know, he writes something on the form that might be consistent with what he said in the text message, but then when confronted by somebody who knows the rules, he changes the explanation? I don't think that the record bears that out. The idea that these are administrative expenses and that Mr. Brown believes they legitimately could count as administrative expenses is never refuted by anything in the record. If you look at the text message at A756 where Mr. Rohrbach read the first part, the next part that wasn't read says Mr. Brown says I really don't know how the administrative fees are being used. When he writes administrative fees, he's doing what Winder's telling him to do, and in the Connolly case, this Court said if it could be But then at some point he explains, oh, they're administrative fees that go to the annuity fund, right? I'm sorry? And I think the government was suggesting, but then when confronted about it, he sort of changes the description to say that the administrative fees were going to support, like the legal fees were going to support the annuity fund and not just general fees. I don't think the record paints such a sharp line between what Mr. Brown thought at one point and what he said at another. I think what it shows is that at all points he believed administrative was a sufficient description, and in sufficiency review, as you know, you have to review all the evidence in conjunction, not in isolation. And that is your position, that Brown just seemed to think it was legitimate to take money from the annuity fund to borrow money to pay administrative expenses of the union and didn't realize that that was impermissible. It's permissible to pay administrative expenses. It is not clear to him when an expense is administrative in the sense that it can be taken. So he asks Winder, and Winder tells him. And there's no evidence that he knows he's part of Winder's eight-year or nine-year fraud scheme, and that's evidenced by the fact that he gets, you know, $3,000 at one point. Thank you, Your Honor. Thank you very much to all counsel very well argued. We appreciate it, and we will take the case under advisement.